**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MAY ALUMINUM, INC., Respondent.**

**No. 24988.**

United States Court of Appeals
Fifth Circuit.

June 20, 1968.

Arnold Ordman, Gen. Cnsl., Dominick L. Manoli, Assoc. Gen. Cnsl., Marcel Mallet-Prevost, Asst. Gen. Cnsl., Leon M. Kestenbaum, Nancy M. Sherman, Stanley Lubin, Attys., N.L.R.B., Washington, D. C., for petitioner.

Louis Paine, Jr., Butler, Binion, Rice, Cook & Knapp, Houston, Tex., of counsel, Thomas R. Beech, Washington, D. C., for respondent.

Before GOLDBERG and CLAYTON, Circuit Judges, and HANNAY, District Judge.

HANNAY, District Judge:

The Respondent resists enforcement of the Decision and Order of the National Labor Relations Board dated August 23, 1966. The Order is based upon the findings, conclusions, and recommendations of the Trial Examiner before whom an extensive hearing was held on alleged unfair labor practices by Appel-

lee under the National Labor Relations Act. Title 29 U.S.C.A. Section 151 et seq.

The Trial Examiner and the Board found that:

1. Respondent violated Section 8(a) (1) of the Act, Title 29 U.S.C.A. Section 158(a) (1) by discontinuing periodic increases after the Union filed its representative petition, by telling employees that they would be "through" if they went on strike, and by telling a striker that the strikers had lost their employee rights and that their opportunities for future promotions were slim;

2. Respondent violated Section 8(a) (5) and (1) of the Act, Title 29 U.S.C.A. Section 158(a) (5) and (1) by failing to bargain in good faith with the Union, by unilaterally granting wage increases to numerous employees, by unilaterally rescinding these increases two weeks later, by failing to furnish the Union with information upon request, and by transferring certain work out of the bargaining unit without prior notice and bargaining and in order to avoid bargaining with the Union.

3. Respondent violated Section 8(a) (3) and (1) of the Act, Title 29 U.S.C.A. Section 158(a) (3) and (1) by refusing to reinstate certain unfair labor practice strikers after unconditional applications by the Union and by the strikers individually.

The alleged unfair labor practices occurred in El Campo, Texas where Respondent is engaged in the manufacture of aluminum extrusions and other aluminum materials and products. Respondent had previously operated a plant in Houston, Texas between 1952 and 1963. The Respondent's employees there were represented by the International Association of Machinists, with whom the Respondent had entered a series of collective bargaining agreements. It appears that the Machinists were originally unsuccessful in attempting to organize the Respondent's employees at the El Campo location. Alleged unfair labor practices against Respondent arose out of this and the reaction thereto; this resulted in a Board finding of unfair labor practices against Respondent and this Court's enforcement of the Board order. See: N.L.R.B. v. May Aluminum, Inc., 5 Cir., 376 F.2d 838 (Per Curiam).

Eventually, the Union won a Board-conducted election and, in December of 1964, it was certified as the exclusive bargaining representative of the El Campo employees. The material facts in this case divide themselves into three separate periods:

1. The period between the Board's certification of the Union and the latter's calling of a strike beginning April 8, 1965.

2. The period between the initiation of the strike on April 8, 1965 and the unconditional offer of the strikers to return to work on April 27, 1965.

3. The period subsequent to the unconditional offer of the strikers to return to work.

I.

Respondent's position is that the essence of the case turns *on the actual bargaining that took place before the strike*, (Emphasis added throughout) which bargaining it alleges to have been in good faith on its part. It is asserted and undisputed that the parties have since agreed to and are now covered by a collective bargaining agreement.

Was there substantial evidence in the record to support the Trial Examiner's findings that Respondent refused to bargain with the Union about wages and failed to bargain in good faith; and was there substantial evidence in the record that the strike of April 8, 1965 was an unfair labor practice strike?

II.

1. Some eleven bargaining sessions were held in the four months period between the Board's certification of December 1, 1964, and the strike of April 8, 1965. The meetings usually lasted 2½ to 3 hours. The chief spokesman for the Respondent was its president, Doyle

M. May. The chief spokesman for the Union was Union Representative Orion White. Present at most of the meetings, but taking no active part in the negotiations, were the Respondent's personnel manager, Ralph Burgess and the Local Union President William McElroy.

The record reflects that the tenor of things to come was indicated by a hastily arranged meeting in May's office between May and White shortly after the successful Union election. Judging from the testimony in the record, White was "given a big blast about the 1964 unfair labor practice charges" and was told to "get out" of May's office if he had no more to say than that he, White, was not there to talk about the charges and that such would be handled by the Government.

Several days after the Union filed its election Petition in October of 1964, the Respondent suddenly discontinued granting certain hour increases. These were the Respondent's 90 day's ½ cent an hour increases. This pertained to a portion of the wage increase program of the Respondent. Significantly, no explanation was given as to why this was done. See: N.L.R.B. v. Zelrich Co., 5 Cir., 344 F.2d 1011, 1014.

Between January 20 and March 9, the parties discussed the articles in the Union's proposal. In effect, agreement was reached on the *pro forma* clauses but not the ones of substance. Implementation of the grievance procedure proved a stumbling block. May broached the proposition, naturally repugnant to the interests of the Union, that the Respondent was seriously considering subcontracting part of its die shop operations. No agreement could be reached on the issue of department versus plant-wide seniority. On both of these issues there is evidence that May took a narrow and intractable position. The same is true in respect to May's position on the Union's insurance proposal. By March 9, the parties had gone completely through the Union's proposed contract. Agreement had been reached on only a rela-

tively few of the nonmonetary proposals and the issue of wages had yet to be negotiated. Such, in substance, is the factual background for the Trial Examiner's conclusion that the Respondent was engaging in surface bargaining.

The last two meetings prior to the strike were held on March 22 and March 25. When the subject of wages was reached, the record reflects that May stated:

"I will tell you right damn quick what we are going to do about these wages. * * * I am not going to do a damn thing. I told these people what I was going to pay them. You told them that you were going to do something else. Now lets see you do it."

On March 30, the Respondent declared its purpose to reinstate and provide the periodic wage increases that had been suspended the previous October. The letter by which this information was communicated in effect blamed the suspension on the Union's organizational campaign. The Union protested this unilateral action by the Respondent. The Respondent countered by rescinding the increase and proposed to deduct any amounts already paid from the employee's next pay-check. The alleged basis for this was the Union's preceding action.

It appears that ample precautions and well considered steps were taken by the Union before calling the strike of April 8. May is quoted in the record as having told White that:

"I don't have to deal with this Union; I will just go around and give raises."

The employees themselves voted overwhelmingly to strike.

The record shows that on the morning of the strike one of the striking employees asked for permission to take his tools; the foreman relayed a message from May that anyone who took his tools out "couldn't come back." The foreman relayed the message to every employee in the shop. Shortly thereaft-

er, May entered the shop and is on record as having declared:

"If you take your tools out, you are not coming back. * * * Just go ahead. * * *"

He then told other employees that they "were fired." Out of this episode there developed a reported colloquy between May and White:

May: Do you see "something funny around here."

White: "Yes, I see something funny around here. Now, you asked for a fight and you have one."

May: "You are goddam right, I did."

On or about April 19, papers were served on White seeking to have him submit to deposition in connection with a projected action against him and the Union for losses to the Company resulting from his action, statements, etc.

On April 15 the meeting scheduled by the Mediation Service was held at the Company office. May would not agree to the check-off provision notwithstanding his indicated affirmative position on it previously. May was adamant against the proposition of departmental seniority notwithstanding the apparent initial progress that had been made on that issue previously. Another such meeting was held on May 20. May's position patently remained adamant. The strike, as heretofore, indicated, ended on April 27; May's position against wage increases remained adamant. This position was maintained through the meeting of May 4 accompanied by acrimonious comments by May against White in connection with the wage increase issue.

By the end of the last meeting, effective agreements appear to have been reached on only some of the non-economic items.

One of the returning strikers was told by a supervisor that when the employees struck they had lost all of their rights which they had built up with Respondent and that their chances of going up with the Company were "very, very slim."

It is clear that the Trial Examiner primarily, and at times exclusively, credited the testimony of Union Representative White and other witnesses called by the Union. *Nonetheless, there is a telling coincidence between these quoted utterances by Company men,* particularly *May, and prior and subsequent Company actions.* Most apparent among these was the unilateral wage-raise suspension in October of 1964 and the indicated re-tender of this increase on and after March 30, 1965. The timing of this action and the quoted utterances and attitude of May on the wage-increase issue support the Trial Examiner's conclusion that there had been Company violations of Sections 8(a) (1) and (5). The tendency of the action in October, under the circumstances, is patently coercive. See and compare: N.L.R.B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed. 2d 435.

"* * * The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged." 375 U.S., at 409, 84 S.Ct., at 460.

Thereafter, the Company action of March 30—April on the wage-increase issue was clearly a unilateral change constituting a failure to bargain. May Department Stores Co. v. N.L.R.B., 326 U.S. 376, 385, 66 S.Ct. 203, 209, 90 L.Ed. 145; N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230; N.L.R.B. v. J. H. Rutter-Rex Manufacturing Co., Inc., 5 Cir., 245 F.2d 594, 597; N.L.R.B. v. American Aggregate Co., Inc., 5 Cir., 305 F.2d 559, 562. Nor was the refusal to bargain here merely "technical" as in N.L.R.B. v. Citizens Hotel Company, 5 Cir., 326 F.2d 501. The underlying circumstances are radically different and the specific action is accordingly distinguishable.

2. In order to be protected in their jobs under the Act, the strikers had to make an unconditional offer to return to work. After the end of the strike, the Union requested a list of Respondent's employees before the strike, their job classifications, rates of pay and dates of hire, etc. so that the Union could determine whether the strikers were being properly reinstated to their former positions at their former rates of pay. The record reveals that May's attitude was that he would reinstate everyone who had not been replaced but would not reinstate any die repairman who had "sabotaged" him. The Respondent did not furnish the Union with the aforementioned requested information until July 1—more than two months after the request had been made—and at that the provided information was silent as to the job classifications of the employees concerned.

Here is another instance of telling coincidence between a quoted Company utterance and subsequent Company action bearing out the deliberateness of the coercive, discriminatory, or unfairly intransigent attitude of the employer.

Other instances, actual or clearly apparent, of coincidence between Company utterance and action are readily discernable in the record:

Some of the strikers were replaced before the end of the strike and the new employees were told that they were being hired as a permanent employee subject to the Company's 45-day probationary period.

Both parties made seemingly *bona fide* efforts to advise all concerned that the strike was over. However, some strikers were told that their positions had been filled during the strike and that they would be offered employment as *new employees* when jobs became available. Some employees who returned pursuant to Respondent's instructions were hired as new employees, assigned to the shipping department at a wage rate of $1.25 an hour without any previously earned seniority or benefits.

Another group of strikers who for one reason or another did not report as directed were not reinstated or rehired by the Respondent at the time.

### III.

■ 1. The conclusion that an employer failed to bargain in good faith is judicially recognizable where there is objective evidence in the record of his strong opposition to Union representation and this hostility is manifested by unfair labor practices before and during negotiations. Local 833, UAW–AFL–CIO, Intern. Union, United Auto, etc. v. N.L.R.B., 112 U.S.App.D.C. 107, 300 F. 2d 699, 705–706, citing and quoting from the concurring opinion of Mr. Justice Frankfurter in N.L.R.B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027:

"* * * A determination of good faith or want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reading such a determination. The appropriate inference to be drawn from what is often confused and tangled testimony about all this makes a finding of absence of good faith one for the judgment of the Labor Board, unless the record as a whole leaves such judgment without reasonable foundation." 351 U.S., at 155, 76 S.Ct., at 757.

■ 2. It is the function of the Trial Examiner and of the National Labor Relations Board rather than this Court to pass upon the credibility of witnesses, N.L.R.B. v. May Aluminum, Inc., 5 Cir., 376 F.2d 838 (1967). The foregoing facts reflected in the record, viewing the record as a whole, Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Golay & Co., v. N.L.R.B., 7 Cir., 371 F.2d 259, 261, cert. den. 387 U.S. 944, 87 S.Ct. 2079, 18 L.Ed.2d 1332, provide "substantial evi-

**52**

dence" to support the findings and conclusions of the Trial Examiner and the Board. The credibility findings by the Trial Examiner were not disturbed by the Board. Nor can they be here on the basis of the whole record and the limited scope of this Court's jurisdiction in this proceeding.

The Petition for Enforcement is granted.