**SOUTHWESTERN PIPE, INC., Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

**UNITED STEELWORKERS OF AMERICA, AFL-CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 28676, 28810.**

United States Court of Appeals, Fifth Circuit.

May 20, 1971.

William A. Brown, Houston, Tex., Guy Farmer, Washington, D. C., Richard C. Keenan, New Orleans, La., Patterson, Belknap, Farmer, Shibley & Wells, Washington, D. C., Kullman, Lang, Keenan, Inman & Bee, New Orleans, La., Powell, Brown & Maverick, Houston Tex., for Southwestern Pipe, Inc.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Nancy M. Sherman, Washington D. C., Clifford Potter, Director, N. L. R. B., Region 23, Houston, Tex., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Lawrence H. Pelofsky, Atty., N. L. R. B., for the N. L. R. B.

James R. Watson, Jr., Houston, Tex., for United Steelworkers of America.

Before COLEMAN, INGRAHAM and WILKEY,* Circuit Judges.

* Of the District of Columbia Circuit, sitting by designation.

WILKEY, *Circuit Judge:*

Southwestern Pipe, Inc. (employer), petitions for review of an order of the National Labor Relations Board requiring it to cease and desist from certain unfair labor practices found by the Board to have constituted bad faith bargaining in violation of Section 8(a) (5) of the National Labor Relations Act,[1] and to reinstate all entitled strikers as unfair labor practice strikers. The latter requirement is based upon findings that the strike was caused by these unfair labor practices and that it was prolonged by the employer's unlawful discharge of striking employees.

The United Steelworkers of America (the union) petitions for review of that portion of the Board's order "tolling" back pay accruing to the strikers after their abandonment of the strike, when they were insisting on group reinstatement as unfair labor practice strikers, as of the day each employee received an individual offer of reinstatement to his exact former position.

*General Background to the Controversy*

The employer is a manufacturing concern that makes and sells pipe and other tubular products, located principally at Houston, Texas. On 23 June 1965, after vigorous pre-election campaigning during which the employer made many assertions in its literature and otherwise opposing unionization, the union was certified as bargaining representative for the production and maintenance employees. Over the next 12 months the employer and union met on 22 different occasions, during which the employer's racial nondiscrimination proposal and the union's proposals regarding institution of a seniority system became major bones of contention between the parties. On 10 June 1966 still another collective bargaining meeting was called for in writing by the employer.

However, shortly after midnight on 13 July 1966, when the union had yet to answer the employer's outstanding request, the firing for insubordination of J. H. Gray, a union committeeman, inspired most of the employees to walk off their jobs. A few hours later, the union ratified this strike, saying that it was in protest of the employer's failure to bargain in good faith.

After the strike began the employer operated the plant without interruption, using as temporary replacements construction workers from its affiliate, Brown & Root, Inc., and set out to hire permanent replacements for the striking employees. At the same time, by letter dated 13 July 1966, the employer notified the union that Gray was "terminated immediately for insubordination" and that all other strikers were "terminated immediately for failure to report to work." The letter also urged all strikers to return to work lest their jobs be taken by permanent replacements. Notices entitled "termination interview" were sent to substantially every employee who failed to show up for duty, indicating the reason for termination to be "failure to report to work."

By 22 August 1966 the employer had obtained permanent replacements for all strikers, and advised the union that strikers would thence be rehired to their former positions only as the particular vacancies arose. The union abandoned the strike on 9 September 1966, and within a few days the employer began to make piecemeal offers of reinstatement, until within about six weeks full and exact offers of reinstatement had been made to all eligible strikers. However, the strikers rejected substantially all of these by identical form letters suggested by the union, insisting that all be reinstated in a group as unfair labor practice strikers. The employer persisted in offering piecemeal reinstatement until August 1968, when pursuant to adverse decision of the Board's trial examiner it was compelled to offer the striking employees group reinstatement as unfair labor practice strikers.

1. 29 U.S.C. § 151 et seq.

*Findings of the National Labor Relations Board*

On charges filed during the strike the Board found that some of the employer's supervisors had made coercive statements in violation of § 8(a) (1) of the Act; that the employer, by insisting upon a racial nondiscrimination clause that would have exposed the union to liability for breach of its duty of fair representation, failed to bargain in good faith with the union in violation of §§ 8(a) (5) and 8(a) (1); that the employer failed to bargain in good faith because it instituted a unilateral shift change during contract negotiations, hence violating the same two sections of the Act; and that the totality of the employer's conduct during the period of negotiation evidenced bad faith bargaining in violation of § 8(a) (5). In addition, the Board found that the employer violated §§ 8(a) (3) and 8(a) (1) of the Act by discharging employees because they went on strike, and concluded that the strike was caused and prolonged by the employer's unfair labor practices. However, departing from its previous policy, the Board did not order back pay to be paid to the strikers from the date the strike was abandoned to the date like offers were made by the employer to all strikers concurrently but tolled back pay as of the time each individual striker was offered his former or substantially equivalent position.

On petition to review the employer urges that the Board was wrong in finding that its insistence upon its racial nondiscrimination clause was negotiation in bad faith, that the unilateral shift change was justified either as a valid management prerogative or as proper conduct in view of the impasse between the parties on the subject, and its conduct as a whole did not evidence bad faith. It further argues that it did not discharge the striking employees, as found by the Board. At any rate the employer posits, even if the Board is upheld in finding one or more of these to be an unfair labor practice, there is no proof that the strike was thereby caused or prolonged.

The union contends that the Board was not justified in departing from its previous policy in unfair labor practice strikes of ordering back pay to be paid up to the day all strikers are offered reinstatement as a group.

With respect to the employer's petition to review in No. 28,676, we find that the Board is not supported by substantial evidence in the record in its conclusions that the employer committed unfair labor practices either by advocating at the bargaining table its proposed racial nondiscrimination clause or by its conduct taken as a whole, and we find that the Board's conclusion that the employer unlawfully discharged striking employees is not supported by substantial evidence. We do find that the unilateral implementation of a shift change by the employer was a *per se* unfair labor practice in violation of § 8(a) (5) of the Act. But we do not conclude that the strike was either caused or prolonged by this or any other acts of the employer; hence, we find that the strike was not an unfair labor practice but an economic strike.

Since the union's petition to review in No. 28,810 hinges upon a threshold determination that the strike was an unfair labor practices strike, we do not reach consideration of other questions on the merits.

*The proposed Racial Nondiscrimination Clause*

At the outset of the contract negotiations, the union proposed and the employer accepted a simple nondiscrimination clause, stating that neither would "discriminate against any employee or applicant for employment because of race, color, creed, national origin, or sex." However, the subject was broached from the following angle much later in the negotiations.

Through many discussions with union representatives, Mr. Brown, the employer's negotiator, had steadfastly refused

to accede to demands for provisions in the contract basing advancement upon seniority rather than merit. In the course of negotiating on this matter, Mr. Dixie, the union representative, had requested and received information from the employer showing the date of hire and classification of each employee. From these data, Dixie drew up a tabulation which, after being rebutted by Brown when Dixie renewed his proposal to give effect to the seniority principle in filling vacancies and promotions, he submitted along with the judgment that it showed at least on the surface whites being discriminatorily paid more than Negroes for the same work. This assessment was received with no small degree of consternation by Brown, and the meeting (the 19th between the parties) broke up.

At the next meeting, three days later on 28 March 1966, seniority was again discussed and Dixie reiterated his charges that Negros were not receiving equal pay with whites for the same work. He requested further information setting out the entire work history and personnel change for each employee. In addition, he proposed that the nondiscrimination clause formerly agreed upon be withdrawn and replaced with the following:

> Company agrees that it will not discriminate in rates of pay, rate of promotion or reclassification, or any other employment condition or benefit on the sole basis of race.

When the parties again met, on 14 April, the employer countered with its own comprehensive nondiscrimination proposal, setting forth its historical commitment to the Plans for Progress and the basic principles of equal opportunity for minority groups, reciting negative commitments in the language of the Civil Rights Act and Plans for Progress regulations, prescribing a program of affirmative action following the employer's existing contractual commitment as a subscriber to the Plans for Progress, calling for joint employer and union review of all employment histories to obliterate any vestige of discrimination to the full satisfaction of the union and the employer before conclusion of the negotiations, proposing periodic review of work histories and practices to assure absence of discrimination and continued implementation of the Affirmative Action Program, with participation of an outside expert advisory consultant on equal opportunity, providing that enforcement be through the specialized consultant, with administrative agency and judicial review as a final resort instead of arbitration, and discouraging undue publicity of racial discrimination problems being processed thereunder.

At first Dixie said he was favorably inclined towards the employer's proposal, and he suggested that all other considerations be tabled so that negotiations could concentrate on it. The meeting was then adjourned subject to Dixie's call after studying the proposal. When the next meeting was held on 19 May 1966, Dixie accepted five sections of the proposed clause as written and he later accepted four more after minor changes in phraseology. Four other provisions to which Dixie objected were not criticized by the Board.

However, Dixie strenuously rejected two clauses of the 51-paragraph proposal, saying that "under no circumstances" would they be acceptable because "the union could not agree to abdicate its position as bargaining representative or sell these people down the river by signing a contract which deprived them of the use of evidence which [as] a matter of common sense and common knowledge, might be the most cogent evidence of discrimination." These provisions were Sections 30.2.2 and 30.2.4, which read:

> 30.2.2 It is recognized the Employer follows an informal system of merit evaluation, on the basis of which wages are determined within the range of wage rates established for the classification of the employee. *No disparity of wage rates within the range of wage rates for the employee's classification, pursuant to*

*Employer's merit program, shall be considered as evidence of discrimination as defined herein.* (Emphasis supplied.)

30.2.4 It is recognized that the Employer follows a system of employee classification in which all employees are classified according to the types of work which they are capable of performing, rather than a system of job classification in which the jobs are classified and evaluated and a rate of pay assigned to such job. *The fact that employees of different classifications and disparate rates of pay are assigned to the performance of the same work shall not be considered discriminatory as such term is defined herein;* provided, however, that where discrimination of the basis of sex is involved, special standards apply. (Emphasis supplied.)

The Board's trial examiner found that if read literally the emphasized portions might be taken to mean that the existence of disparate wage rates could *never* constitute evidence of racial discrimination, and he concluded that this was the employer's intent.[2] He said:

What of the case where the facts disclosed that the negro had the earlier date of employment in the classification, possessed superior skills, and had a higher production rate but the negro nevertheless was placed in a lower classification at a lower rate or was in the same classification at a lower rate? In such a case, the wage and classification disparity would be the key evidence supporting a charge of racial discrimination, but, *under a literal application of the proposed language of 30.2.2 and 30.2.4,* "such disparity shall not be considered discriminatory as such term is defined herein." It appears that the Union would be barred from processing a case on behalf of a

negro employee in that situation *unless one reads the last sentence of the definition clause* [in Section 30.2] (that *disparity alone* is no indication of discrimination) modifies the literal application of 30.2.2 and 30.2.4 to mean that the mere existence of disparity in wage rates and classifications shall not be sufficient evidence in and of itself to warrant a finding of discrimination. The Trial Examiner is unable to read this meaning into the two sections and, therefore, finds that the proposal in these areas would preclude the Union from processing the case described. (Emphasis supplied.)[3]

From there the examiner went on to find that the union's agreement to such proposals in the face of information that indicated, at least to Dixie, that a pattern of discrimination existed in which Negroes were assigned lower classifications and paid lower wages than whites would be a breach of its duty to represent all employees in the bargaining unit fairly, *i. e.,* in a nondiscriminatory manner. The examiner therefore concluded that the employer's proposition of and insistence on these provisions constituted bad faith bargaining in violation of §§ 8(a) (5) and (1) of the Act. This conclusion was adopted by the Board. We disagree.

Not only did the examiner choose to ignore the definition of "discrimination" in Section 30.2 (of which both provisions 30.2.2 and 30.2.4 are subsections), which reads:

30.2 The term "Discrimination" for purposes of this Article XXX, is defined as disparate treatment of an employee or applicant for employment, in whole or in part, because of one or any combination of the following reasons: (a) race, (b) color, (c) religion, (d) sex, (e) national origin, or (f)

2. In this regard, we note that the two provisions objected to relate to preservation of the employer's merit and job classification systems, which the union was determined to replace in whole or in part with a seniority system, and which the

employer was just as determined to maintain.

3. The examiner's opinion is digested, but without this quoted language, at 1969 C.C.H. N.L.R.B. ¶ 21,316.

membership or nonmembership in any labor organization or participation or non-participation in any protected union activity. *It is recognized that disparity is the essence and result of all human evaluation and that disparity alone is no indication of discrimination as herein defined.* (Emphasis supplied.

But he also ignored provision 30.2.1 of the same section which explained, in pertinent part:

> For discrimination * * * the disparate treatment must have been * * * caused by one of the prohibited reasons * * * to the exclusion of other reasons for disparate treatment to which Employer in fact gave effect. * * *

Yet he gave no reason why he found himself unable to read these other provisions of the same section in harmony with provisions 30.2.2 and 30.2.4—a reading which saves the latter two provisions from patent illegality by modifying their literal terms to mean that disparity *alone* in wage or classification could not be considered discriminatory.[4]

With respect to this point, the Board appears to argue that we should not harmonize these provisions with the remainder of the section because the employer had a "history" of racially discriminatory practices regarding wage and job assignments, and indicated its intent to continue them by refusing in the contract negotiations to tender any explanation to the union regarding the union's racial discrimination charges beyond the bare assertion that it did not practice discrimination. We should not, so the argument goes, be blinded by the apparent neutrality of the provisions but should perceive that they were "calculated" to achieve discriminatory results in the administration of the contracts.[5]

In support of its argument the Board cites to us "background" information that "in the past" Negro employees had been denied higher wage rates and wage increases because of color, had not been allowed to compete for higher-rated jobs because of color, had been assigned less favorable parking facilities than whites, and had been required to contribute greater amounts to charities than whites. The Board tells us that the latter two practices are shown by the record to have been discontinued "prior to" the union's campaign, leaving the record's silence on the first two as an indictment of the employer.

We agree neither with the "facts" as recited by the Board nor its interpretation. With respect to the latter two practices, the Board's use of the phrase "prior to" to describe the point in time in which they were abandoned by the employer is a gross understatement. It is undisputed that the employer removed all racial barriers and segregated practices with the first Executive Order under the Eisenhower Administration requiring government contractors to follow nondiscriminatory employment practices. And we find no basis in this case for inferring that the employer thereafter maintained an established practice of denying employees higher wage rates, wage increases, or chances to compete for higher-rated jobs because of color. Indeed it would conflict with record evidence to do so.

The record shows instance after instance of Negroes occupying choice jobs throughout the plant, including supervisory and inspection positions, some with responsibility for the work of whites

---

4. Read literally, the two provisions would serve to create or perpetuate discriminatory conditions by removing the primary source of proof. United States v. Hayes International Corporation, 415 F.2d 1038, 1043 (5th Cir. 1969). This is patently illegal. Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Cf.* Conley v. Gibson, 355 U.S. 41, 46–47, 78 S.Ct. 91, 2 L.Ed.2d 80 (1957); Richardson v. Texas and New Orleans Railroad Co., 242 F.2d 230 234 (5th Cir. 1957).

5. *See* Griggs v. Duke Power Company, *supra*, n. 4.

(hardly exemplary of "tokenism" in a plant whose work force is 70% Negro).[6] In addition, the employer has an impressive list of credentials establishing it as a leader in the equal opportunity field: It was one of the first signatories to the Plans for Progress of the President's Committee on Equal Opportunity, had passed government inspection for compliance with the Equal Opportunity clause of government contracts, had never had a civil rights complaint filed against it, and had been commended and used for demonstration of equal opportunity accomplishment in seminars of Negro school teachers conducted by Texas Southern University.

Contrary assertions by the parties led to a heated exchange between their representatives at the 19 May meeting, when the union representative alleged that the information supplied him "appeared to establish strongly" the existence of racial discrimination in various departments of the plant. This ended when he, at the employer representative's insistence, dictated a series of questions pinpointing according to his information and opinion instances of discrimination.

The Board's brief claims that the employer refused to answer these questions; however, we agree with the trial examiner who in his decision states as fact that "[o]n June 10, Brown wrote Dixie stating that he had completed his analysis on the alleged racial discrimination situations suggested in Dixie's statement and that the cases cited (differences in rates of pay within classifications between whites and negroes and differences in classifications and rates of pay between whites and negroes allegedly performing the same or similar work) were explainable on factors other than race." In the same letter Brown also requested another bargaining session and suggested the employment of Dr. J. B. Jones, a Negro professor at Texas Southern University, as a mediator to adjust the conflicting claims of the union and the employer on the existence and correction of racially discriminatory practices. This letter was not answered by the union representative before 12 July 1966 when the strike intervened.

It is not the function of a federal appellate court to substitute its own judgment for that of the NLRB so long as the latter's determination is supported by "substantial evidence" in the record.[7] But here the record is devoid of any reasonable basis supportive of the gloss the Board attempts to impart to this case in defense of its conclusion that provisions 30.2.2 and 30.2.4 cannot reasonably be read in light of the remainder of Section 30.2, but ought instead to be read separately and literally so as to show a design by the employer to achieve discriminatory results in the administration of the contract.

The record supports precisely the opposite point of view: that far from attempting to stymie the union or wheedle from it an agreement that would have constituted a failure to represent equally all its members, the employer proposed and advocated these provisions at the bargaining table in all good faith. Even if a different interpretation of the language proposed is possible—we think such would be illogi-

6. The record shows that seven of the twenty-three supervisors are Negroes, and that they supervise white employees. It also shows that three of the nine mill operators, the top and highest paying non-supervisory job, are Negroes; that as many Negroes make more than $2.07 per hour as there are whites who make less; and that Negroes hired as unskilled laborers have been trained and advanced to skilled jobs, including the top non-supervisory job of mill operator. In the face of the fact that the majority of the jobs in the plant are unskilled and that the principal labor market for unskilled labor in Houston is Negro, these statistics hardly justify censure of the employer as a practitioner of racial discrimination.

7. Amalgamated Clothing Workers of America, AFL-CIO v. N.L.R.B., 125 U.S.App. D.C. 275, 280–281, 371 F.2d 740, 745–746 (1966).

cal—yet proof of possible ambiguity is not proof of bad faith. Therefore we find that the employer's actions in this regard did not constitute bad faith bargaining in violation of §§ 8(a) (5) and (1) of the Act.

### The Unilateral Shift Change by the Employer

Up until 10 June 1966 the employer maintained a three-shift operation and made permanent employee shift assignments. However, on this particular day the employer instituted a trial program of rotating shifts every four weeks with the shift change time advanced by one hour. This action was taken after an informal poll of the employees showed that the majority were in favor of such arrangement. At no time was the union consulted, neither prior to the taking of the poll nor before the actual implementation of the change.

In its brief the employer defends its action on two grounds: first, that this was necessary managerial action taken pursuant to its proposed management prerogatives clause which had been substantially agreed upon on 28 March 1966; and, second, that even if there were no binding agreement giving the employer the exclusive right to fix and change shift times and assignments, the negotiations had reached an impasse on this subject, freeing the employer to act in the matter without consulting the union.

We agree with the Board that both grounds are without merit. The proposed management prerogative clause as of 10 June 1966 provided, in pertinent part:

> 3.1 Employer has the exclusive right to manage the business and plant and to direct the working force, *subject only to the provisions of this agreement.* Without limiting * * * nothing herein shall be construed to limit or restrict the exclusive right of the employer to hire, assign, transfer, * * * to determine the time and

manner in which the work shall be performed * * *. (Emphasis supplied.)

The record shows that only the first sentence of this clause had been agreed to by 10 June. Thus, so far as the union was concerned, the employer's supposedly exclusive management rights were subject to the provisions of the agreement. We think it goes without saying, therefore, that the employer could hardly assume to act under the guise of this "exclusive right to manage the business and the plant" without first knowing all of the contract provisions to which this right was to be subject.

Also, we cannot credit the employer's claim that an impasse had been reached on the matter of changing shift times and assignments because the record is clear that these particular subjects had not been discussed at all prior to institution of the change. What had been discussed and what the employer had resisted were union proposals affording shift preference to senior employees and barring shift rotation. Brown, however, understood that these proposals were still being tendered by the union, were still dynamic, and had not stalemated in deadlock with any counterproposals made by the employer. The inference is strong in these circumstances that one of the possible motivations for institution of shift rotation could have been the alleviation of senior employee disgruntlement at poor shift assignments and hence the weakening of employee interest in one aspect of the seniority issue.

■ Whether or not there would be shift preference based on seniority or shift rotation was, therefore, a condition of employment still under negotiation when the employer unilaterally instituted the latter. We need go no further to find that in so doing the employer committed an unfair labor practice in violation of § 8(a) (5) of the Act. For regardless of whether the employer in all good faith was bargaining with the un-

ion to reach an overall agreement,[8] a breach of the duty to bargain on one of the mandatory subjects of § 8(d) of the Act—one of these being conditions of employment—*is* a violation of § 8(a) (5). N.L.R.B. v. Katz.[9]

*The Company's Bargaining as a Whole*

█ In its brief, the Board contends that the record supports a finding that, as a whole, the employer was bargaining in bad faith. In support of this stance and to "shed light" upon the atmosphere in which the contract negotiations were conducted, it points to pre-election campaign letters sent by the employer to each employee stating that the company did not want a union, that employees would receive more from the company than the union, that the company would concede no more benefits to the union that it would to the employees if not so represented, and that unions meant strikes and possible job loss.

According to the Board, the attitude during the contract negotiations of the employer towards the prospect of union representation is further illuminated by seven instances of supervisor statements found and conceded to have been "coercive" in violation of § 8(a) (1) of the Act. The most serious of these were attributed to Production Superintendent DuBois, who on different occasions asserted that the company could not operate with a union, that it would shut its doors before it would sign a contract with a union, that continued support of the union would result in a reduced

work week, and that if a strike occurred strikers would be immediately replaced and non-strikers promoted.[10]

Further evidence of the employer's general determination not to bargain in good faith to reach agreement with the union is found by the Board in the employer's unilateral implementation of shift rotation, which we have discussed immediately above, and in the number of meetings held between the parties without, the Board alleges, the employer coming to agreement except "in areas of legal obligation, conformity to existing practice, or on minor matters." And to clinch its case against the employer, the Board argues that the employer's unlawful intent was manifested at the bargaining table itself when, in its view, "the Company sought to compel the Union to contravene its statutory duty of fair representation by foreclosing itself from obtaining relief for unit employees from racially discriminatory practices."

In reviewing the record to determine if it contains "substantial evidence" supporting the Board's determination that an employer failed to bargain in good faith, involving as it does an inference of another's state of mind, a reviewing court is well advised to consider the admonition of Mr. Justice Frankfurter, concurring in part and dissenting in part in N.L.R.B. v. Truitt,[11] that "[t]he appropriate inferences to be drawn from what is often confused and tangled testimony * * * makes a finding of absence of good faith one for

---

8. We have no doubt at this point that the employer *was* in all good faith attempting to reach an overall agreement with the union and was not purposefully dragging its heels to frustrate the negotiations. Though we have inferred that the institution of the shift change was not motivated by the best of intentions towards the union, but was perhaps intended to alleviate low employee morale feeding an aspect of the seniority issue, this is a far cry from an imputation to the employer of overall subjective bad faith.

9. 369 U.S. 736, 742–743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

10. The Board thus seems to contend in its brief that the pre-election campaign letters and the supervisor statements showed that the employer entered the negotiations with less than an open mind and a willingness to reach an agreement consistent with the respective rights of the parties. *See* N.L.R.B. v. Texas Coca-Cola Bottling Co., 365 F.2d 321, 322 (5th Cir. 1966).

11. 351 U.S. 149, 155, 76 S.Ct. 753, 757, 100 L.Ed. 1027 (1956) (Frankfurter, J., separate opinion, concurring in part and dissenting in part).

the judgment of the Labor Board, unless the record as a whole leaves such judgment without reasonable foundation." Of course, the Board has never been allowed unfettered discretion in the determination of any matters and thus to eliminate the right to judicial review; its conclusion that the employer failed to bargain in good faith must be supported by objective evidence in the record. N. L.R.B. v. May Aluminum, Inc.[12]

■ The reasonableness of the Board's foundation in this case has been considerably weakened at the outset by our previous determination in favor of the employer on the issue of the racial nondiscrimination clause. We find that when stripped of its racial discrimination mooring the Board's conclusion on overall bargaining is unsupported by objective record evidence. Given that the employer before the election said it did not want a union, something it had a perfect right to do in campaigning,[13] and given that certain supervisors, the most senior of whom was DuBois, a second line supervisor, made coercive statements after the union was certified,[14] there is no evidence linking the mood indicated by the latter to the decision-making management. There is simply nothing in the record showing that Brown, the employer bargaining representative, or any other company official either knew of these statements or authorized them. In fact the record shows that these statements actually violated company policy and that the employer had assured the employees in writing of its diametrically opposed position.[15]

The employer's unilateral implementation of shift rotation, which we have found likely to have been motivated by a desire to lessen employee interest in an aspect of the seniority issue, does not in the absence of something more blossom into a manifestation of employer's intent not to reach general agreement with the union at all. Yet the only "something more" is the Board's allegation that the employer in all the meetings had between the parties agreed only "in areas of legal obligation, conformity to existing practice, or on minor matters."

The latter is wholly insufficient in itself to support the Board's conclusion of bad faith bargaining, H. K. Porter Company, Inc. v. N.L.R.B.;[16] moreover, it is belied by the record. It is clear that one of the prime reasons negotiations were protracted was that the union changed negotiators three times. Through it all the employer never withdrew one clause of the contract that had been agreed upon while the union did so in several instances, including the racial nondiscrimination clause withdrawn by Dixie. Finally, the employer actually did agree with the union far beyond the "minimums" suggested by the Board. In fact, the record shows that the only areas in which the employer was unwilling to make concessions were, as might be expected, those involving rating, advancement, and layoff of employees on the basis of merit rather than seniority.

---

12. 398 F.2d 47, 51 (5th Cir. 1968).

13. We know of no case that has ever held that in its pre-election campaign literature the employer cannot say that it does not want a union, and the Board has cited none. Such statements thus serve a supportive role only and cannot in and of themselves impute bad faith bargaining later to the defeated employer.

14. This case is thus distinguishable on its facts from N.L.R.B. v. May Aluminum, supra, n. 12, where the unlawful coercive statements were made by the president of the corporation. See also Radiator Specialty Co. v. N.L.R.B., 336 F.2d 495, 497 (4th Cir. 1964), where the court found supervisor statements more extreme than those in this case too slight, too fragmentary to show bad faith bargaining on the employer's part.

15. The employer had said in letters to the employees during the campaign that company policy was not to discriminate against those voting for the union, and that they should report any threats made by supervisors.

16. H. K. Porter Co., Inc. v. N.L.R.B., 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970).

The Board's conclusion that the employer's conduct as a whole evidenced an intent to bargain in bad faith with the union is therefore unsupported by objective facts in the record, and accordingly the Board's order in this regard is set aside.

### The "Discharge" of the Striking Employees

█ The Board's holding that the employer discharged the strikers for exercising their right to strike rests upon only a part of the evidence and ignores other evidence which in our minds is of determinative significance.

The employer did two things which might possibly be construed to support the Board's holding: (1) On the day of the strike, 13 July 1966, it sent slips entitled "Termination Interview" to each striking employee; and (2) it sent a letter to Mr. C. T. Ray of the United Steelworkers stating, among other things, "2. All other strikers are terminated immediately for failure to report to work." [17]

But this is, of course, by no means the whole story.

(1) The termination slips sent to each employee showed each employee (except J. H. Gray) as being terminated for "Failure to report for work," and not "Fired." J. H. Gray's termination slip showed "fired for insubordination." Since a strike had begun, the employer felt it essential to terminate the striking employees from the active payroll immediately, in order to clear the computer preprint and authorize the immediate issuance of special pay checks instead of the regular data processing checks which would have been issued at some later date. With the exception of Gray, the strikers were never removed from "employee" status by the employer. The strikers continued in the group hospitalization and life insurance plans; during the strike arrangements were made through the union for the direct payment of premiums.

(2) The letter to the union representative, on the same day as the termination slips to the strikers, after referring to Gray's conduct, said:

With respect to the other strikers, the plant manager has been given the following instructions:

1. J. H. Gray is terminated immediately for *insubordination*.

2. All other strikers are terminated immediately for *failure to report to work*.

3. All employees who do report to work, even after initially participating in the strike will be reinstated except:

    (a) J. H. Gray (b) Any other person who has been permanently replaced.

\*   \*   \*   \*   \*   \*

We request that you convey to all of the striking employees that you represent a full explanation of this action being taken by the Company. We hope that you will prevail upon the employees to call off their strike and return to work immediately so as to minimize the risk that they will lose their positions by replacement. (Emphasis supplied.)

It is apparent from this letter on the same day the strike was initiated that the word "terminated" was used with at least two meanings *i.e.*, fired in the case of J. H. Gray, but for other individuals merely suspended so long as they remained on strike. Subparagraph 3 of the letter makes clear that all strikers could be immediately reinstated by sim-

---

17. In addition, the memory of another act of the employer conceivably may have lingered and influenced some workers' interpretation of the above employer acts on the first day of the strike. On 11 February 1966, five months earlier, in response to an earlier walkout not ratified by the union, it had sent a letter to all employees saying "Yesterday, a group of employees walked off their jobs because another employee had been discharged. This was an act of insubordination and defiance of authority which will not be tolerated. Employees who engage in such activity are subject to discharge and permanent replacement."

ply reporting to work. Certainly no ordinary man on the street, nor any former employee who had been actually discharged or fired, would have had that option. Furthermore, the letter concluded with a plea for the union representative to prevail upon the employees to call off their strike and return immediately, so as to minimize the risk that they would *lose their positions* by replacement. Anyone actually discharged or fired had no position to lose.

Since it is obvious that the word "terminate" has at least two meanings, we think the meaning and thus the characterization of this particular action of the employer must be determined by consideration of all the actions of the employer taken on the day of the strike and shortly thereafter. All other actions, beginning with the letter of the same day to C. T. Ray, the efforts of the employer to get the strikers to return individually or collectively to *their positions*, the retention of all strikers except Gray in an employee status—as evidenced by their participation in group hospitalization and life insurance plans, and uninterrupted service in the retirement and savings plan—all prove that the employer did not attempt to discharge any striker except J. H. Gray on 13 July 1966. Strikers were taken back without any loss of status both during and after the strike to the extent of the positions available, on the individual application of the employee. All applicants have now been fully reinstated to their exact former jobs without any loss of status as continuous service employees.

On this record we find that the Board clearly erred in characterizing one particular action of the employer as the discharge of employees for exercising their statutory rights to strike, and therefore we find that there was no violation of §§ 8(a) (3) and (1) of the Act.[18]

*Causation of the Strike*

■■ The basic issue here is whether the strikers enjoyed the status of unfair labor practice or economic strikers, hence whether the employer was obliged to fire replacements in order to make way for an en masse return of the strikers once the strike was abandoned.

We start with the premise that a strike must, as a matter of law, be treated as an unfair labor practice strike if an employer's unfair labor practice was a contributing cause.[18] But unlike the Board, which found ample support for causation in its conclusions that the employer committed unfair labor practices in advocating its proposed racial nondiscrimination clause, in bargaining in bad faith as a whole, and in instituting the shift change unilaterally, we have found a *per se* unfair labor practice violating § 8(a) (5) only in the latter. The fact that this constituted a *per se* violation we emphasize because such determination has not involved on our part any finding that the employer lacked in its overall bargaining the subjective good faith to come to terms with the union. Quite the opposite, we have found it clear throughout that the overall bargaining of the employer with the union was a good faith effort to come to a final expression of agreement.

Furthermore, it is clear from our analysis of the shift change issue that the employees could not have gone on strike because they were disgruntled, in whole or in part, by the institution of shift rotation in the preceding month. A poll of the workers prior to institution of the change showed the majority to be in favor of it. And it cannot be

18. Our conclusion here moots the issue of prolongation of the strike considered by the Board in its opinion since that issue is based on the proposition that even if the strike were economic at its inception it was prolonged by the *unlawful discharge* of the striking employees, which was allegedly calculated to both increase their resentment and to discourage them from seeking to return to their jobs. Having been shorn of its underpinnings by our determination that there was no unlawful discharge, the issue falls.

forgotten that the strike began shortly after midnight, on the shift whose personnel would have benefited most by the change.

This is not to say that the walkout that occurred was not in support of the union's goals. We do not disclaim the Board's finding that the firing of Gray was merely the "trigger" that set off a strike seated in deeper reasons. Negotiations had dragged on for a year and the union representatives had been giving less than optimistic reports of their progress to the membership. The record indicates that at a meeting in May with the membership (about one month before implementation of the shift change), Dixie sensed the mood of discontentment among the workers and cautioned against a strike at that time.

But whatever the discontent of the employees, it was clearly not caused by any unfair labor practice of the employer. Accordingly, we set aside the determination of the Board on this issue.

### Conclusion

Having found that the Board is unsupported by substantial evidence in the record in its determinations that the employer committed unfair labor practices in advocating its racial non-discrimination clause, in its bargaining as a whole, and having found further that the strike was economic in nature and was not caused or prolonged by any unfair labor practices of the employer, we grant review and deny enforcement to the Board orders grounded upon these considerations.

As to the § 8(a) (5) violation involved in the unilateral shift change, the Board order will be enforced.

The cases are remanded to the Board for the entry of appropriate orders, including those as to the posting of notices, not inconsistent with the opinion of this court.