NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

J. P. STEVENS· & COMPANY, INC.,
GULISTAN DIVISION, Respondent.

No. 73–3175.

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1976.

Elliott Moore, Deputy Assoc. General Counsel, Paul Elkind, Chief of Contempt Litigation, Michael S. Winer, Atty., N.L.R.B., Washington, D. C., Walter C. Phillips, Director, Region 10, N.L.R.B., Atlanta, Ga., Stanley R. Zirkin, Atty., N.L.R.B., Contempt Litigation, Washington, D. C., for petitioner.

Whiteford S. Blakeney, Charlotte, N. C., for respondent.

Before WISDOM, COLEMAN and GEE, Circuit Judges.

COLEMAN, Circuit Judge.

The National Labor Relations Board seeks to have the J. P. Stevens Company held in civil contempt for disobeying two prior Fifth Circuit decisions ordering the Company to bargain with the Textile Workers Union as the certified representative of Stevens' employees at its plant in Statesboro, Georgia, *J. P. Stevens and Co. v. NLRB,* 5 Cir. 1971, 441 F.2d 514, *enforcing,* —— NLRB ——, *cert. denied,* 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971); *NLRB v. J. P. Stevens and Co.,* 5 Cir. 1971, 455 F.2d 607, *enforcing* (without opinion) 186 NLRB 180 (1971). The Board asserts that Stevens has contemptuously failed to bargain in good faith. In three respects, we agree.

We referred the petition to a Special Master for findings of fact and recommendations. The Master found that the Company had failed to meet its good faith bargaining duty in three broad categories. First, the Company had undertaken unilateral changes in workload, work organization, and wages without first affording the Union a chance to negotiate the changes. Second, Stevens had unreasonably delayed furnishing, or had failed altogether to furnish, information needed and requested by the Union to negotiate an employees' contract. Third, the Company had not bargained in good faith concerning the subject of union dues checkoff, an arrangement whereby employees could choose to have their union dues automatically withheld from their paychecks. The Master recommended that Stevens be held in contempt. The Master did determine that Stevens had not breached its duties when it refused to

enter into tentative agreement on identical contract proposals.

## I. FACTS

The decrees of this Court ordering Stevens to bargain were handed down on March 22, 1971, and December 2, 1971. Pursuant to those decrees, the Company and the Union met to bargain 22 times between January 7, 1972, and June 27, 1973. Scott Hoyman was the Union's principal negotiator. He was assisted by Alan Gordon. Chief spokesmen for Stevens were William C. Little, Assistant to the Vice-President for Industrial Relations, and Billy R. Smith, Plant Manager at Statesboro.

During the bargaining sessions, all four principals made notes of the proceedings, but the Master found that the most accurate set was prepared by Union negotiator Gordon. The Master relied extensively on Gordon's notes in his findings. For reasons stated *infra,* we do not overturn the Master's appraisal of Gordon's notes.

### A. *Unilateral Changes*

During the bargaining session of January 18, 1972, Union negotiator Hoyman informed the Stevens representatives that the Union wished to be informed beforehand of any planned changes in the Statesboro plant that would affect employees. On February 8, 1972, the Union reiterated this desire and warned the Company that "changes made unilaterally [would] violate the Act". Speaking for Stevens, Little replied: "We are aware of that."

### (1) *Unilateral Changes in Dye House Operations*

On February 22, 1972, Plant Manager Smith informed the Union that business at Statesboro was lagging and that dye house operations would be placed on a four day work week. Business continued to drop and at the March 3, 1972 bargaining session the Company warned that layoffs and/or shorter hours might be implemented. Definite plans to counter the economic decline were reported to the Union on March 17, 1972, when the Company announced layoffs of eleven employees in the dye house. The Master found that Stevens did not inform the Union that the layoff would cause changes in job content, job assignment, shift assignments or workload. In fact such changes did occur in the dye house as a direct result of the layoffs.

### (2) *Unilateral Merit Wage Increases*

From April 26, 1971, until June 19, 1972, Stevens granted 18 merit wage increases to nine employees in the Statesboro maintenance department. The Union was not notified in advance of these increases. Consequently, it had no chance to bargain with the Company regarding who should receive the raises or how much should be given.

At the bargaining session of June 22, 1972, the Union protested the unilateral increases. In response, the Company insisted that the increases were routine but, nevertheless, offered to retract them. The Union declined the offer.

The granting of merit increases was a discretionary act by Stevens management. They had never formulated guidelines defining eligibility for increases, when eligibility would occur, or the amounts of the increases.

### (3) *Unilateral Grant of General Wage Increase*

At the very first bargaining session, held January 7, 1972, the Union presented Stevens with a written contract proposal that included several economic provisions, among them a proposed 10% general wage increase for the represented Statesboro employees. The Company signified it would consider the proposal but that it wanted more details.

The Company submitted its first proposed contract on February 7, 1972. It contained no economic proposals because, as Stevens claimed, it was awaiting more detailed data regarding Union economic proposals. At the February 22, 1972, bargaining session, the Union reasserted its desire to entertain economic counterproposals from Stevens. The Company responded as it had on Febru-

ary 7, saying it would wait for more detail from the Union. In reply, the Union asked the Company to come forward with counterproposals based on the limited data already before it. The Company said it would note the Union request.

Approximately six months later, on July 11, the Union again protested Stevens' failure to tender an economic counterproposal. The Company said it viewed the Union proposals as a "framework" and that it would respond to any "specific proposals" by the Union.

Finally, on August 10, 1972, Stevens submitted a second proposed contract, the first to contain economic proposals. Stevens' wage proposal called for no raise at all.

At the next bargaining session, held on August 31, the Union protested the niggardly Company proposal and countered with a request for an immediate seven per cent increase. Union representative Hoyman pointed out that approximately 85% of Stevens' Statesboro employees earned less than $2.75 per hour, and, even under the wage controls in effect at that time, those employees were entitled to raises without Pay Board approval. The Company promised to consider the Union proposal. During the September 19 bargaining session, Stevens advised that it still had the proposal under consideration.

During the October 17, 1972 meeting, however, Stevens hand delivered to the Union the following letter notice:

As you are perhaps aware, a general wage increase movement is presently under way in the Southern Textile Industry.

Our Company is today announcing in its plants, other than Statesboro, that it is filing an application with the Pay Board for approval of an increase for hourly paid employees. We enclose a copy of the announcement which is being posted in the other plants of the Company.

We will, of course, bargain with you on this matter at our meeting today if you wish, and in such further meetings as may be needful. On the other hand, it may be your desire, as it was in December of last year, that we go ahead and

make, the same announcement in the Statesboro Plant as is being made in the other plants of the Company. Our doing so will, of course, not preclude or prejudice any further bargaining between us on the subject of wages, as on all other matters.

Please let us know your wishes on this.

Company representatives confirmed that the increase being sought through the Pay Board was intended for all the J. P. Stevens' network, including the Statesboro plant. Union negotiators vehemently protested the one-sidedness of this procedure. Moreover, Stevens' negotiators Smith and Little were totally ignorant of the amount requested of the Pay Board and of the application date. As the session closed, the Union asked to be supplied that information as quickly as possible. It also requested a copy of Company communications with the Pay Board.

On October 23, Stevens wrote the Union that the application had been filed and that it was indeed a company-wide proposal. The letter stated that the amount and effective date requested were not yet known. The Company finally conveyed that information to the Union in a telephone conversation of October 25.

On November 2, the Union wrote a letter to Stevens again protesting the handling of the wage increase, particularly Stevens' failure to treat the Statesboro plant as a bargaining unit separate from other Stevens plants. In addition, the letter renewed the Union request for a copy of the Stevens' application to the Pay Board.

On November 10, 1972, Stevens informed the Union by letter that the Pay Board had approved the Company request and that the increase would go into effect December 11, 1972 for all plants except Statesboro. The increase was to be held in abeyance at Statesboro pending agreement by the Union.

By letter of November 17, 1972, Stevens promised to supply the Union with a copy of the Pay Board application. The copy was not received, however, until November

21, after the Pay Board had approved the raise. The November 17 letter also promised that Stevens would bargain further with the Union for an additional pay raise for Statesboro, but when the Union reiterated its seven per cent compromise proposal, the Company indicated the Union "had available . . . two choices . . . five and one-half per cent [approximately the amount approved by the Pay Board] or zero." If the Union wanted to bargain further, Stevens promised to "listen".

To avoid the appearance of blocking a pay raise, the Union agreed to let the Pay Board increase take effect at Statesboro.

## B. *Failure to Supply Information*

### (1) *Pay Board Information*

When informed of the Stevens' Pay Board application, the Union asked to be told the amount and date proposed by the Company. The Union also requested a copy of the application. The Company's treatment of these requests has already been discussed.

As noted above, the Company presented the Union with a copy of the Pay Board application on November 21, 1972. The application contained a detailed cost breakdown of wages and fringe benefits for the entire J. P. Stevens Company. At the December 1, 1972 bargaining session, the Union requested a similar breakdown for the Statesboro plant, the purpose being to enable the Union to formulate more intelligent economic contract proposals. Stevens never produced that data.

### (2) *Employment Benefits, Policies or Rules*

Before negotiations began, the Union wrote the Company a letter on November 2, 1971, which included the following request for information:

In order to assist the Union in bargaining for the employees of the Statesboro Plant, we would like to be supplied with the following information:

\* \* \* \* \* \*

4. A description of the fringe benefits currently in effect at the Statesboro Plant such as holidays, paid vacations, insurance plans, retirement plans, shift premiums, overtime premiums if any beyond those required by law, reporting pay, call-in pay, etc. In the case of insurance programs and retirement plans, we would appreciate a copy of any descriptive booklets.

5. If the Company has employee manuals which describe seniority arrangements, leave of absence policies, safety and health rules and other similar matters, we would appreciate being supplied with written copies of these policies.

The Company responded with the following letter on December 3, 1971:

The fringe benefits at this plant include the following. New Year's Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day are paid holidays. We likewise provide vacations with pay. The vacation pay is 2% of gross earnings for employees who have been in our continuous employment from 1 year up to 5 years, and 4% of gross earnings for employees who have been in our continuous employment for 5 years or more. We have a group insurance program and a profit sharing security and retirement program. Each of these is explained in a printed booklet, and in accordance with your request we are enclosing a copy of each of these booklets. We pay a premium of 5 [cents] per hour for work performed on the 12 o'clock midnight to 8 o'clock A.M. shift. If an employee reports for work at his regular time, without having been told not to do so, he is guaranteed at least 2 hours pay, and if he is actually put to work on a job, he is guaranteed at least 4 hours pay. An employee called in to work at other than his normal work time, receives either 2 hours pay or the pay for the time he works, whichever is greater.

We do not have any employee manuals dealing with the matters referred to on page "2" of your letter, such as seniority, leaves of absence, and the like.

During the first negotiating session, the Union told the Company that it had learned that jury duty pay was among the fringe benefits offered by Stevens but that it had not been listed in the Company letter of December 3, 1971. The Company admitted it gave jury duty pay but simply had overlooked it in drafting the December 3 letter. The Union indicated that it wanted to draft contract proposals as precise as possible, and, with that in mind, it needed inclusive information from the Company regarding fringe benefits or employee practices. Stevens said it had many writings of varying detail. To that Hoyman replied, according to his own testimony, that "if they had written information about fringe benefits, that we wanted it." On the other hand, Stevens insists that Hoyman said that he would be requesting some of the Company's information from time to time throughout the negotiations. The Master credited Hoyman's testimony.

Thereafter, on January 18, the Union specifically requested any written material on safety rules and procedures, and rules of conduct and discipline "whether the Company actually gave these to employees or not". The Company said it had a written pamphlet of departmental safety rules, but that it had no rules for employee conduct.

At the February 8 meeting Stevens supplied the Union with a copy of the safety rules from the spinning department, as an example of the rules in force from department to department. In addition, Hoyman asked whether the Stevens' representatives had the company's discharge and discipline policies with them. The following discourse then transpired:

LITTLE: We don't have any written rules of conduct beyond some safety rules.

SMITH: I have the safety rules.

LITTLE: We don't have any rules of conduct beyond these.

HOYMAN: I asked for 1) written policy on discipline and discharge 2) written safety rules 3) written conduct rules.

LITTLE: Smith has the safety rules not the others.

HOYMAN: Are these [safety rules] plant or company-wide rules?

SMITH: I don't really know. I think they were made here.

HOYMAN: Are [they] uniform or particular to Statesboro?

LITTLE: Not uniform. I think they are only for Statesboro.

SMITH: We have no rules of conduct.

HOYMAN: I don't only mean posted rules, I mean any written rules which supervisors are directed to enforce. For example against drinking or drugs.

SMITH: I don't think there are any.

LITTLE: No such written rules of conduct.

HOYMAN: We asked if Company had written policy about administration of discipline.

LITTLE: Isn't that the same as a moment ago?

HOYMAN: No.

LITTLE: We haven't got it with us. I don't recall status of your last request.

HOYMAN: We renew our request for that information.

LITTLE: We are not highly formalized. We don't choose to operate under a prescribed set of rules. We try to follow a rule of good judgment and common sense.

On February 22, the Company produced its written policies on discipline and discharge, despite its earlier insistence that such policies did not exist.

On August 10, 1972, Stevens submitted its second proposed contract. The document contained general proposals on work hours, overtime, transfers between departments, military service, seniority, leaves of absence, discharge and discipline, shift premium pay, reporting pay, vacation pay, and insurance. At the August 31 meeting Hoyman criticized these proposals as being too vague. In addition, the Union renewed its request for information regarding the administration of fringe benefits.

In response to the Union request for specificity, on September 19 the Company supplied the Union with a detailed description

of employer policies on vacation pay, jury duty pay, call-in pay, reporting pay, shift premium pay, overtime pay, leaves of absence and holidays. Hoyman protested that much of this information had been requested at the inception of the bargaining, nine months in the past, but the Company had said it did not exist. Discussion of the detailed data ensued, during which the Company admitted that the policies antedated the negotiations and that they were embodied in company manuals. Stevens further admitted the manuals had been available prior to the negotiations, but insisted they were *supervisory* manuals whereas the Union had requested *employee* manuals.

On October 17, Company negotiators provided the Union with additional written policies. Among the subjects covered were absenteeism, safety rules, tuition reimbursement, maternity leaves of absence, and medical services. This information given the Union on October 17 and that produced on September 19 was much more detailed than that contained in the Company letter of December 3, 1971. Moreover, some fringe benefits were included that were not listed in the December 3 letter or at any subsequent time, i. e., maternity leave of absence, reimbursement for educational courses, and medical services provided by the employer.

### C. *Refusal to Tentatively Agree on Identical Contract Proposals*

After Stevens presented its initial proposed contract on February 7, 1972, the parties compared corresponding proposals to gauge how far they were from agreement. In the process the Union altered its provision on union recognition so that it conformed with that proposed by the Company. After doing so the Union marked the clause "OK—2/7/72", and explained the process as it did so. Stevens offered no response, neither to object nor to agree.

On the next day, the principals continued their line-by-line analysis. During the day the Union discovered that the respective proposals on military service also were identical, and Union negotiators offered to initial the provision "OK". This time the Company objected that it did not wish to be bound to any contract on a provision-by-provision basis. The following discussion ensued:

LITTLE: These are markings of your own not any final agreement. To us they merely indicate that we seem to have no apparent difficulty. We want to talk about a total package.

HOYMAN: If it is the Company's intention, and if we don't reach a total contract we are not bound by anything. We agree, unless we have an agreement on everything, we have an agreement on nothing.

LITTLE: No agreement is final unless we agree to a total document.

HOYMAN: As I understand your disagreement on these words, [it] is that you don't want to agree to these words until we agree to a whole contract.

LITTLE: Although we have no difficulty, later discussion may reflect back on these terms.

HOYMAN: We have no objection to a party withdrawing agreement on a particular point at a later date, but we wanted to appear on the record that there was no difference of opinion between the parties on a particular date.

\* \* \* \* \* \*

LITTLE: Again, we are ready to proceed on the basis that Military Service seems to present no difficulty. The same point relates to the Recognition Article which you marked okay yesterday.

HOYMAN: It is my intention to credit you with this type of equivocal position with regard to anything I may want okay. That is the qualifications you attached to my okay of Article V. I assume you attached to everything else we seem to be in agreement on.

LITTLE: It is not a qualification. It just appears that we have no obstacle to this part of a total agreement.

In early March, 1973, the National Labor Relations Board informed Stevens that it was under investigation for bargaining in bad faith.

On April 25, 1973, Stevens proposed by letter that the following notation be appended to clauses on which the parties substantially agreed: "There is no objection to this article (or paragraph) being included in the contract." The Union rejected the technique.

### D. Refusal to Bargain on Union Dues Checkoff

At the first bargaining session, the Union unveiled its first proposed contract which recommended, among other things, giving employees the option of authorizing Stevens to deduct union dues from paychecks. On January 18 Stevens indicated disagreement with such a procedure, and subsequently submitted this counterproposal: "[e]mployees shall . . . be free to pay dues to the Union or otherwise support the Union, or not, as they may see fit."

On March 17, 1972, the parties discussed dues checkoff at length. The Company expressed a dislike for paycheck deductions because the consequent reduction in take-home pay stoked demands for higher wages. Union representative Hoyman pointed out that the Union proposal merely offered employees the option of checking off union dues. Consequently, according to Hoyman, the Company would be freed from pressure to raise wages because employees could choose to personally handle their dues if they felt uncomfortable with the paycheck deduction.

Stevens representatives admitted they deducted numerous items from the paychecks of Statesboro employees already. The deductions already withheld were: (1) state and federal income tax, (2) social security, (3) group insurance, (4) tools and safety equipment purchased through the Company, and (5) credit union deposits. In addition, Company representatives said some Stevens plants made charitable deductions and some had savings plans and Christmas clubs. Nevertheless, the Company objected to an *additional* deduction.

To this objection, Hoyman responded that the Union would agree to a provision allowing employees to choose to substitute union dues checkoff for credit union deductions, thereby eliminating the "additional" nature of the checkoff. Moreover, Hoyman noted that the checkoff deduction would be "[m]uch less than the deduction for the credit union". Stevens perceived the substitution proposal as requiring it to act upon the continuing viability of the credit union.

Stevens stood firm in its opposition to checkoff, and Company representative Little closed the March 17 meeting with this declaration: "You cannot go out at us as refusing. We are not refusing to anything, we are just waiting to be persuaded. We are just not persuaded yet."

## II. THE LAW AND ITS FACTUAL SYNTHESIS

### A. Preliminary Discussion

 In an instance like this, where the Board seeks an adjudication of civil contempt, it bears the burden of proving contempt by clear and convincing evidence. *E. g., NLRB v. Southwire Co.*, 5 Cir. 1970, 429 F.2d 1050, 1053, *cert. denied*, 401 U.S. 939, 91 S.Ct. 932, 28 L.Ed.2d 218 (1971); *NLRB v. Laney & Duke Storage Warehouse Co.*, 5 Cir. 1970, 424 F.2d 109, 112; *NLRB v. Standard Trouser Co.*, 4 Cir. 1947, 162 F.2d 1012, 1014. Of equal importance is the standard rubric that a court may adopt a special master's findings of fact unless they are clearly erroneous. Federal Rules of Civil Procedure, Rule 53(e)(2). *See also, e. g., NLRB v. Alamo Express, Inc.*, 5 Cir. 1969, 420 F.2d 1216, 1217; *NLRB v. Standard Trouser Co., supra*. With a few major exceptions, the parties do not dispute the Master's findings in this case, and, finding nothing clearly erroneous in the findings, we substantially adopt them as our own.

 In their briefs the parties evince differing views of how the two aforementioned principles interact. We believe the proper view is to subject the Special Mas-

ter's findings of fact to the clear and convincing standard. If the findings are supported by substantial evidence, credited by the Master, and if they clearly and convincingly demonstrate contemptuous conduct, an adjudication for civil contempt is justified.

By and large, Stevens' objections to the Master's findings concern the Master's choice of conflicting testimony, primarily his adoption of typewritten transcripts of the bargaining sessions prepared by Union negotiator Alan Gordon. In this regard it bears mentioning that a Master's fact finding responsibility includes the authority, based on his observation of witnesses, to choose between conflicting testimony. *NLRB v. Spartanburg Sportswear Co.*, 4 Cir. 1960, 278 F.2d 312, 313. The Master chose the Gordon notes as being more reliable than the sketchy notes prepared by the Company negotiators, Little and Smith. The distinguishing trait of the preferred notes was their scope. Whereas the Company notes were brief outlines, Gordon's notes report the bargaining substantially verbatim. Throughout the sessions Gordon maintained a low profile. He rarely spoke because he was busily transcribing dialogue. On the other hand, the Company negotiators jointly shared Stevens' bargaining responsibilities and both often engaged in discussion. Their active roles precluded them from preparing notes as extensive as Gordon's, and this is reflected in the Master's preference for the Union notes.

Despite Company insistence to the contrary, the Master found Gordon's method of preparing the typed transcripts inherently reliable. Although not present for all 22 bargaining sessions, Gordon attended most. When present, he transcribed the proceedings in shorthand and later dictated the dialogue into a recorder. Dictation normally occurred the business day following the session, but once four days to a week intervened. A secretary then typed out the recording, a process that normally required a day or two. On one occasion, when a secretary quit and a replacement had to be found, a session was not typed up for about

two weeks. After the typing was completed, Gordon read the product to insure accuracy, but he did not make a line-by-line comparison with his shorthand notes. Moreover, such a comparison is not now possible because the original notes have been lost or destroyed.

The aforementioned typing lag, caused by a secretary's resignation, produced an "inconsistency" in the transcript. The problem arose with the notes for the October 17, 1972 bargaining session, the session in which Stevens surprised the Union by announcing the Pay Board application of which Company negotiators knew neither the amount nor the effective date. Gordon's notes for October 17 faithfully transcribed the discussion in which the Union lambasted the Company for, among other things, not knowing the amount requested. However, in an odd display of prescience, the notes for the very same day included a notation indicating that the Company had notified the Union that the amount was 5.4%. According to Gordon, the difference was due to the typing lag. The Union first learned of the amount in a telephone conversation October 25, 1972, at which time the October 17 notes had not yet been typed. By the time the notes were typed, Gordon had noted the October 25 telephone call and included it in his notes.

Stevens also insists the notes are unreliable as much for what they omitted as for what they included. Stevens points out an instance in which Gordon omitted an explanation for Company action, an explanation which both Smith and Little testified was explored at the bargaining session. We do not believe this discrepancy was fatal to the general credibility of the notes. The notes do not purport to be a literally verbatim transcript as indeed they could not have been. Furthermore, the Company has had every opportunity to supplement the notes, and we consider them here only as a *substantially* accurate narrative of what was said, rather than what was not said, at the bargaining sessions.

■ Another Stevens' objection to Gordon's notes is that under the Federal Rules

of Evidence, Rule 803(5), the notes were inadmissible hearsay. This contention is plainly wrong. The notes are not hearsay because they are not offered to prove the truth of the statements reported. Rather, they are offered only to prove the content of discussions which actually occurred, *NLRB v. Tex-Tan, Inc.*, 5 Cir., 1963, 318 F.2d 472, 483–84.

This Court has twice ordered Stevens to bargain in good faith with the Union. If it has not so bargained, it must be held in civil contempt, *McComb v. Jacksonville Paper Company*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *NLRB v. Ralph Printing & Lithographing Company*, 8 Cir., 1970, 433 F.2d 1058, *cert. denied*, 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971); *NLRB v. Whittier Mills*, 5 Cir., 1941, 123 F.2d 725, 727. Therefore, the issue is simply whether the evidence reflects that Stevens has not bargained in good faith with the Union. This must be qualified, of course, with the caveat that we have no authority to compel Stevens to agree contractually to anything. It does not have to agree; it must, however, bargain in good faith. Certainly, obstinacy may not serve for legitimacy, thereby circumventing bargaining obligations. *See NLRB v. Herman Sausage Co.*, 5 Cir. 1960, 275 F.2d 229, 231–34.

### B. *Unilateral Changes in Workload, Job Organization, and Wages*

A company, engaged in bona fide contract negotiations with a union certified to represent the company's employees, violates its duty to bargain collectively when it institutes changes in employment conditions without first consulting the union. *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *NLRB v. J. H. Bonck Co.*, 5 Cir. 1970, 424 F.2d 634, 638; *NLRB v. Laney & Duke Storage Warehouse Co.*, 5 Cir. 1966, 369 F.2d 859, 866, 869; *NLRB v. American Mfg. Co.*, 5 Cir. 1965, 351 F.2d 74, 79; *NLRB v. Zelrich Co.*, 5 Cir. 1965, 344 F.2d 1011, 1015. The employer's power to alter working conditions in his plant is not contingent upon union agreement with his proposed change. The company has only to notify the union before effecting the change so as to give the union a meaningful chance to offer counter-proposals and counter-arguments. *NLRB v. Citizens Hotel Co.*, 5 Cir. 1964, 326 F.2d 501, 505.

Even though Stevens notified the Union of the impending dye house layoff, the Board contends the layoff was a proscribed unilateral change in that it caused increases in workload and a shift in job assignments for holdover employees, layoff effects which the Union did not foresee. The Master accepted this argument and recommended that we hold Stevens in contempt for its actions relative to the layoff. We disagree with this position.

Stevens' duty was merely to present the Union with a meaningful chance to offer input into the decisional process. Given that opportunity the Union could negotiate the change so as to get the best possible deal for the employees. The Union was notified of the layoffs. Common sense would tell the Union that the unit could not operate as had theretofore been the case. We are of the opinion that the facts surrounding the dye house layoff do not establish a clear and convincing case of contempt. *See NLRB v. Laney & Duke Storage Warehouse Co.*, 5 Cir. 1970, 424 F.2d 109.

The merit wage increase unilaterally given maintenance department employees is of a more serious nature. In *NLRB v. Katz, supra*, merit wage increases were granted 20 of the 50 employees in the bargaining unit without first notifying the union. The Supreme Court held such increases to be violations of the duty to bargain unless the company granted them as part of a long-standing, non-discretionary pattern of pay raises. If not "a mere continuation of the status quo", *Katz, supra* 369 U.S. at 746, 82 S.Ct. at 1113, the employer had failed to bargain. *See also NLRB v. Ralph Printing and Lithographing Co.*, 8 Cir. 1970, 433 F.2d 1058, *cert. denied*, 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971); *NLRB v. Phil-Modes, Inc.*, 5 Cir. 1969, 406 F.2d 556,

557; *NLRB v. Wonder State Mfg. Co.*, 8 Cir. 1965, 344 F.2d 210.

The Union received no prior notice of the merit increases involved here. Moreover, the Master found that employer discretion primarily influenced the Company decision, and the record clearly supports that conclusion. Stevens had no tangible guidelines to determine which employees received an increase, when they should receive it, nor how much increase should be granted. Management discretion, rather than well established rules, decided each variable. Consequently, Stevens' action was not a "mere continuation of the status quo".

Nevertheless, Stevens argues that eighteen merit increases granted to nine employees in a large bargaining unit like Statesboro do not violate the duty to bargain because they were isolated instances not rising to the level of contempt. Stevens' *de minimis* argument relies heavily on *White v. NLRB*, 5 Cir. 1958, 255 F.2d 564. *See also NLRB v. Little Rock Downtowner, Inc.*, 8 Cir. 1969, 414 F.2d 1084; *NLRB v. Phil-Modes, Inc.*, 5 Cir. 1969, 406 F.2d 556, 557. We disagree.

The instant situation is factually distinguishable from *White*, where each increase was singularly justifiable and was granted prior to commencement of bargaining sessions. *White, supra* at 565. Stevens has not individually justified its raises, some of which were granted after bargaining sessions commenced. More significantly, all the instant increases were granted while Stevens was under an affirmative order to bargain.

■ Moreover, apparently insignificant unilateral action that may constitute *de minimis* activity when undertaken by a company with a clean slate in labor law, must be viewed more warily when committed by one who enjoys a record for intransigence like that of the J. P. Stevens Company.[1] When a company has historically evinced disdain for employees' rights and the Congressional mandate, its prior history

is relevant to the question of a *de minimis* failure to bargain. *NLRB v. Little Rock Downtowner, Inc.*, 8 Cir. 1969, 414 F.2d 1084, 1088–89; *NLRB v. Citizens Hotel Co.*, 5 Cir. 1964, 326 F.2d 501, 506.

Stevens' record at Statesboro does not inspire a sense of approval. Its prior unfair labor practices prompted the Board to impose upon Stevens the extraordinary duty to bargain—extraordinary because the Union had lost the only representation election ever held at the Statesboro plant. This order was enforced by this Court in one of the decrees which forms the subject of this contempt petition. *NLRB v. J. P. Stevens & Co.*, 5 Cir. 1971, 441 F.2d 514, *enforcing* —— NLRB ——, *cert. denied*, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971). Under these circumstances Stevens' action is not insignificant. With regard to these merit wage increases, it is quite clear that the Company, contrary to our prior decrees, failed to bargain with the Union.

■ Furthermore, the Company did not remedy its transgression by its *ex post facto* offer to rescind the pay raises. *See Central Illinois Public Service Co.*, 139 NLRB 1407, 1417 (1962), *enf'd, NLRB v. Central Illinois Public Service Co.*, 7 Cir. 1963, 324 F.2d 916. Had the Union accepted the offer, thereby placing its imprimatur on the retraction of the raises, the Union would have been in great danger of alienating its constituency.

■ We also agree with the Board's position regarding the general wage increase. It is rudimentary that a company cannot legally institute a general wage increase without first consulting its employees' bargaining representative. *See generally NLRB v. Crompton-Highland Mills, Inc.*, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949). Agreement by the union is not a prerequisite to implementation of the raise, but the union must be allowed to air its views beforehand. *A. H. Belo Corp. v. NLRB*, 5 Cir. 1969, 411 F.2d 959, *cert. de-*

---

1. J. P. Stevens and Company has a long history of labor relations litigation. Assuming no intervening Stevens cases have been reported

pending this decision, the instant case is *Stevens XIV*.

*nied,* 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970). Even when the parties cannot agree to the amount of an increase, a company cannot unilaterally implement any raise higher than the offers made to and rejected by the union. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *A. H. Belo Corp. v. NLRB,* 5 Cir. 1969, 411 F.2d 959, *cert. denied,* 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970); *NLRB v. Tex-Tan, Inc.,* 5 Cir. 1963, 318 F.2d 472.

■ The instant case contains a slightly different wrinkle, the Company informed the Union before actually implementing the instant raise but not before submitting it to the Pay Board for approval.[2] Nonetheless, unilateral application to the Pay Board for permission to grant a raise higher than any offered to the Union must, in all logic, be viewed as tantamount to granting the raise without prior Union consultation. *See May Dept. Stores Co. v. NLRB,* 326 U.S. 376, 384, 66 S.Ct. 203, 90 L.Ed. 145 (1945).

Stevens' only arguments regarding the general pay raise are of a factual nature: it insists that it intended the Pay Board application to serve only as a foundation figure upon which the parties could bargain for even higher raises. In its November 17, 1972 letter to the Union, Stevens offered to bargain beyond the 5.4% application figure which was to go into effect December 11. Despite this offer, however, Stevens refused to up the Statesboro increases from 5.4% to 7.0%, nor did the Company counterpropose an intermediate figure. Instead Stevens offered the Union the Pay Board amount *or nothing.* By unilaterally asking the Pay Board to permit a wage increase higher than any previously offered the Union, Stevens refused to bargain. *See May Dept. Stores v. NLRB, supra* at 384, 66 S.Ct. 203. It matters not that Stevens may have intended the Pay Board amount as a base for higher bargaining. Finally, the Master rejected this factual argument, and this was not clearly erroneous. Consequently, we hold Stevens violated our prior

orders by its actions on this item in controversy.

## C. *Failure to Supply Information*

■ The case law allows no equivocation regarding the obligation to supply data. A company which fails to produce relevant information violates its duty to bargain. *NLRB v. Acme Ind. Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); *Anaconda Wire and Cable Co. v. NLRB,* 7 Cir. 1971, 444 F.2d 1028, 1035–36. The only requirements are that the union must request the data and it must be relevant to a legitimate interest of the union. *General Electric Co. v. NLRB,* 6 Cir. 1972, 466 F.2d 1177, 1182–83; *Curtiss-Wright Corp. v. NLRB,* 3 Cir. 1965, 347 F.2d 61; *Timken Roller Bearing Co. v. NLRB,* 6 Cir. 1963, 325 F.2d 746, *cert. denied,* 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964); *NLRB v. Item Co.,* 5 Cir. 1955, 220 F.2d 956, 958, *cert. denied,* 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955). In this Circuit, requested data must be supplied unless it is plainly irrelevant. *NLRB v. Celotex Corp.,* 5 Cir. 1966, 364 F.2d 552, *cert. denied,* 385 U.S. 987, 87 S.Ct. 601, 17 L.Ed.2d 450 (1966). In addition, an employer fails to bargain in good faith when he unreasonably delays production of requested, relevant data. *NLRB v. Arkansas Rice Growers Cooperative Ass'n,* 8 Cir. 1968, 400 F.2d 565 (four month delay unreasonable); *NLRB v. May Aluminum, Inc.,* 5 Cir. 1968, 398 F.2d 47, 51 (two month delay unreasonable).

■ The facts demonstrate that Stevens failed to produce some of the relevant, requested data and delayed by nine months or more in producing the remainder. The requested cost breakdown of wages and fringe benefits at Statesboro never materialized. The Union needed that data to formulate meaningful contract proposals. Details regarding, among other things, fringe benefits were not forthcoming from Janu-

---

**2.** These 1972 negotiations occurred during Phase II of the federal wage and price controls

then in effect, hence the Pay Board involvement.

ary, 1972 until October, 1972. That data was needed to insure that the Union would not ask for less in its contract proposals than the employees already received from the Company.

Stevens' defense is totally factual, insisting it did not produce the detailed fringe benefit data before October because the details were embodied in supervisory manuals, whereas the Union requested details from employee manuals. This argument is specious. Moreover, Stevens contends the information trickled in slowly over nine months because the Union asked for piece by piece production. Stevens insists that Union representative Hoyman, at the very first bargaining session, said he would request data "from time to time" throughout the bargaining process. Hoyman denied the remark before the Master, and his testimony was credited. As we have noted, to choose between conflicting testimony is primarily the province of the Master. However, even assuming the facts to be as Stevens insists, their defense would not explain the failure to produce the requested cost breakdown, nor would it explain the fringe benefits which Stevens revealed for the first time in October, 1972. Consequently, we hold that Stevens refused to bargain in good faith on the subject of information production.

### D. Union Dues Checkoff

Union dues checkoff is a mandatory subject of bargaining. *Sweeney & Co. v. NLRB*, 5 Cir. 1971, 437 F.2d 1127. This means only that union and company must bargain about dues checkoff; it does not mean they must agree on the subject. Indeed, the National Labor Relations Act empowers the Board and the courts to insure contractual freedom to employees as well as to employers, but it does not grant the power to impose agreement. *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); *United Steelworkers of America v. NLRB*, D.C.Cir.1968, 129 U.S. App.D.C. 80, 390 F.2d 846, *cert. denied*, 391 U.S. 904, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968). Therefore, the relevant issue when

disagreement arises is whether the company actually bargained in good faith or was merely obfuscatory. Analysis of the company's bargaining postures is the only method of characterizing negotiations as in good faith or not: Every position on issues of mandatory bargaining, like dues checkoff, must reflect a legitimate business purpose, otherwise the company has not bargained in good faith. *NLRB v. F. Strauss and Son*, 5 Cir. 1976, 536 F.2d 60 (1976). Disagreement on the mandatory subject of dues checkoff is present here, thus we analyze Stevens' bargaining posture for evidence of legitimacy.

Although it deducts numerous items from paychecks, including some deductions not required by law, Stevens defends its negative posture on the ground that more deductions create pressure for wage increases. The Union countered by proposing optional substitution of dues checkoff for an elective deduction already offered by Stevens. Stevens did not budge and it was not required to sacrifice a program already in successful operation.

Stevens' desire to minimize pressure for wage increases, although somewhat emasculated by the optional substitution proposal, is a legitimate business purpose. The Master believed the Company had failed to bargain in good faith. However, under all the circumstances we cannot say the Board has met its burden of proof on the issue. Consequently, Stevens may not be found in contempt relative to dues checkoff.

### E. Tentative Agreement

With regard to this issue, the Master believed that no finding of contempt was appropriate. In his view the bargaining dialogue between Company and Union showed that both considered themselves tentatively agreed on the subjects of union recognition and military service. The only disagreement was semantic; the parties agreed to the provisions but disagreed as to whether a formalistic device should signify that agreement. Little wanted it clearly understood that the parties had reached no

ultimate agreement. On February 8, 1972, he told Hoyman, "It appears as if we are saying the same thing, but we are short of an agreement. It seems that we have no difficulty agreeing to this provision. But we have no final agreement on this position."

The Union position, as expressed by Hoyman, substantially mirrored Little's feelings. Consequently, this does not constitute a clear and convincing case of contempt, and we agree that no contempt holding is appropriate relative to this subject.

### III. SUMMARY

In summary, we hold that the Company failed to bargain in good faith in three respects:

1. In granting the "individual merit" wage increases;

2. When it instituted proceedings with the Pay Board for general wage increases; and

3. By failing, or unreasonably delaying, the supply of requested relevant bargaining data.

Consequently, as to these items the J. P. Stevens Company must be held in civil contempt of court, *McComb v. Jacksonville Paper Company*, 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

### IV. FURTHER PROCEEDINGS

That the remedy prescribed for the civil contempt precisely fits the particular aspects of this case must be, and is a matter of special concern to the Court.

Consequently, we direct the parties to file special briefs addressed to the remedy which should be imposed for the civil contempt. The Clerk of this Court will prescribe the briefing schedule.

Jurisdiction of this proceeding is expressly retained for the purpose of defining the remedy and for such other and further orders as may, in the premises, be mete and proper.

Petition that J. P. Stevens and Company be adjudicated in civil contempt, GRANTED.

Jurisdiction for further proceedings, RETAINED.