623 F.2d 322
 104 L.R.R.M. (BNA) 2573, 89 Lab.Cas. P 12,095
 J. P. STEVENS & CO., INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
AMALGAMATED CLOTHING & TEXTILE WORKERS UNION, AFL-CIO, CLC, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 79-1247, 79-1254.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 4, 1980.
Decided June 11, 1980.
 
 Homer L. Deakins, Jr., Greenville, S.C. (Ogletree, Deakins, Smoak, Stewart & Edwards, Greenville, S.C., on brief), for J. P. Stevens & Co., Inc.
 Barbara Jane Carey, Asst. Gen. Counsel, New York City (Arthur M. Goldberg, Gen. Counsel, Joel Ronald Ax, Deputy Gen. Counsel, New York City, on brief), for Amalgamated Clothing & Textile Workers Union, AFL-CIO-CLC.
 Joseph P. Norelli (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief), for N. L. R. B.
 Before BUTZNER and SPROUSE, Circuit Judges, and JOSEPH C. HOWARD, United States District Judge for the District of Maryland, sitting by designation.
 BUTZNER, Circuit Judge:
 
 
 1
 J. P. Stevens & Co. and the Amalgamated Clothing and Textile Workers Union petition for review of an order of the National Labor Relations Board holding that J. P. Stevens & Co. violated §§ 8(a)(1) and (5) of the National Labor Relations Act (29 U.S.C. §§ 158(a)(1) and (5)).[1] Stevens seeks to set aside the order, and the union requests expansion of the remedy. The Board cross-petitions for enforcement. We enforce all of the provisions of the order except one. The exception concerns reimbursement for litigation and negotiating expenses; we remand this question to the Board for further consideration.
 
 
 2
 * The union's predecessor[2] was certified in September, 1974, as collective bargaining representative for 3,000 production and maintenance employees at the company's seven plants in Roanoke Rapids, North Carolina. The parties promptly commenced negotiations and met frequently during the next two years without reaching a bargaining agreement. During the negotiations, the union charged the company with committing a number of unfair labor practices. The complaints that subsequently issued, save one that was settled, were consolidated. After extensive hearings, the administrative law judge particularized in minute detail the basis for his factual findings, all of which the Board adopted.
 
 
 3
 The Board held that Stevens violated §§ 8(a)(1) and (5) by making unilateral changes in compensatory time for double shifts, holiday pay, and choice of personal respirators. Other violations were delays in furnishing relevant information about efficiency ratings and standards of weavers, new job descriptions for inspectors, and specific data about the selection of respirators. The Board's findings of fact are supported by substantial evidence, and its conclusions are warranted by law. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 222, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring); NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956).
 
 
 4
 As amended the complaint charged, and the Board found, that during negotiations the company instituted corporate-wide changes respecting profit sharing, wage rates in 1975 and 1976, and a group insurance program. Despite requests for information concerning these mandatory subjects of bargaining, the company withheld relevant information and announced or implemented the changes at a time and in a manner that precluded realistic bargaining at Roanoke Rapids. Referring to the company's conduct, the Board said:
 
 
 5
 (I)n four separate instances (Stevens) engaged in a bargaining strategy violative of Section 8(a)(5) of the Act. This tactic consisted of developing comprehensive improvements in corporatewide benefit programs, keeping the Union in the dark regarding information necessary and relevant for purposes of collective bargaining, and timing the announcement or implementation of these changes to preclude any meaningful negotiation concerning their possible implementation at the Roanoke Rapids facility.
 
 
 6
 There can be no doubt that this conduct violated § 8(a)(5). NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Besides, the Board detected in this bargaining strategy more than isolated unfair labor practices. Finding that the union's choice of either accepting or rejecting these unilateral changes was in fact illusory, the Board observed: "The record . . . clearly demonstrates that this tactic was a most effective means of undermining the collective-bargaining process and denigrating the union's status as collective-bargaining agent." The Board therefore held that "these violations go to the very heart of the Act and our national policy." We find no error in the Board's assessment. Indeed, the company's essentially similar tactic in bargaining at its Statesboro plant was deemed contemptuous in NLRB v. J. P. Stevens & Co., 538 F.2d 1152, 1163-64 (5th Cir. 1976).
 
 
 7
 In NLRB v. Truitt Mfg. Co., 351 U.S. 149, 154-55, 76 S.Ct. 753, 756-757, 100 L.Ed. 1027 (1956), Mr. Justice Frankfurter, concurring in part and dissenting, explained the Act's requirement of good faith bargaining:
 
 
 8
 (The Act) obligate(s) the parties to make an honest effort to come to terms; they are required to try to reach an agreement in good faith. "Good faith" means more than merely going through the motions of negotiating; it is inconsistent with the predetermined resolve not to budge from an initial position. But it is not necessarily incompatible with stubbornness or even with what to an outsider may seem unreasonableness. A determination of good faith or of want of good faith normally can rest only on an inference based upon more or less persuasive manifestations of another's state of mind. The previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations constitute the raw facts for reaching such a determination. The appropriate inferences to be drawn from what is often confused and tangled testimony about all this makes a finding of absence of good faith one for the judgment of the Labor Board, unless the record as a whole leaves such judgment without reasonable foundation.
 
 
 9
 The Board adhered to these precepts. To ascertain the state of mind of the company's responsible officials, it considered all of the circumstances attending the years of fruitless bargaining. The Board took cognizance of conduct, thoroughly documented in the record, that included the company's dilatory tactics, its adamant adherence to demonstrably unreasonable positions, its dissemblance with respect to its plans for changes in conditions of employment, its denigration of the union, the lack of authority of its negotiators who were uninformed about company policy, and the history of the company's hostility to the union. From the totality of this evidence, the Board rationally could draw the inference that the company had not bargained in good faith as required by the Act. See, e. g., International Ladies' Garment Workers Union v. NLRB, 463 F.2d 907, 917 (D.C.Cir.1972); Kellwood Co. v. NLRB, 434 F.2d 1069, 1072-74 (8th Cir. 1970); NLRB v. May Aluminum, Inc., 398 F.2d 47, 51 (5th Cir. 1968); NLRB v. Fitzgerald Mills Corp., 313 F.2d 260, 264-65, 265-66 (2d Cir. 1963); NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 134-35 (1st Cir. 1953); Great Southern Trucking Co. v. NLRB, 127 F.2d 180, 185 (4th Cir. 1942).
 
 II
 
 10
 The remaining issues concern the remedies that the Board ordered. The company insists that some of them must be rejected, and the union complains that they are inadequate. Briefly summarized, the Board's order requires the company: to cease and desist from the unfair labor practices committed at its Roanoke Rapids plants and at other facilities where a union establishes its legal right to represent employees; to post at all plants and mail to employees an appropriate notice and letter; to afford the union access through bulletin boards and representatives in non-working areas on non-working time, and to allow equal time to respond to company speeches on the subject of union representation; upon request to bargain collectively in good faith with the union as exclusive representative of the Roanoke Rapids employees. The bargaining order was amplified by a provision requiring the company:
 
 
 11
 to notify the Union promptly of any decision to announce or institute systemwide changes in employee benefits; to produce upon request all information relevant thereto for purposes of collective bargaining, prior to the announcement or implementation of such changes in benefits on a companywide basis; and to afford the Union an opportunity to negotiate regarding similar or identical contemplated changes at the Roanoke Rapids plant.
 
 
 12
 The Board also ordered the company to make whole the employees for losses suffered by the unilateral changes in holiday and double shift policies and to pay the union's reasonable negotiating expenses and the Board's and the union's reasonable litigation costs.
 
 
 13
 Section 10(c) of the Act (29 U.S.C. § 160(c)) states that the Board, upon finding that an unfair labor practice has been committed, "shall issue . . . an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this (Act) . . . ." The Board's choice of remedy is particularly a matter within its own discretion, open only to limited review. Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 215-16, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964). That choice should stand "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric and Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).
 
 
 14
 These principles warrant enforcement of the Board's cease-and-desist order. In view of the fact that the company's bargaining tactics resembled in part those found unlawful at the Statesboro plant in NLRB v. J. P. Stevens & Co., 538 F.2d 1152 (5th Cir. 1976), application of the cease-and-desist order to other plants where a union legally attains representative status is a remedial measure calculated to prohibit repetition of the company's unfair labor practices. We have recognized that the Board can order an employer to cease unfair labor practices at its other plants on proof of a violation at one location when company-wide policy is involved. Heck's, Inc., 159 NLRB 1151, 1157-58 (1966), enforced, 387 F.2d 65 (4th Cir. 1967) (2d case); see also NLRB v. Heck's, Inc., 388 F.2d 668, 669 (4th Cir. 1967).
 
 
 15
 The provisions of the order concerning company-wide dissemination of the notice and access to company plants is similar to the order in J. P. Stevens & Co., Inc., 240 NLRB No. 35 (1979), enforced, 612 F.2d 881 (4th Cir. 1980); see also NLRB v. J. P. Stevens & Co., Inc., 563 F.2d 8 (2d Cir. 1977). The company argues, however, that the imposition of remedies dealing with the union's organizational efforts has nothing to do with a refusal to bargain in an organized plant. It relies on the unquestioned proposition that the Board cannot impose punitive orders. See Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938).
 
 
 16
 This provision of the Board's order is predicated on its finding that the company employed its unlawful bargaining strategy to chill the union's organization of other plants. The notice and access order is designed to counteract the use the company has made at other plants of its unfair labor practices in bargaining at Roanoke Rapids. Therefore the order is not punitive. It is designed to "effectuate the policies of the Act." Virginia Electric & Power Co., 319 U.S. at 540, 63 S.Ct. at 1218; Republic Steel Corp. v. NLRB, 311 U.S. 7, 12, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940).
 
 
 17
 We also find no occasion to set aside that portion of the order requiring the company to give notice of proposed systemwide changes, furnish information, and bargain with the union regarding the contemplated changes for the unit at Roanoke Rapids. Contrary to the company's assertion, this provision does not require it to bargain over benefits for unrepresented employees. The order is specifically limited to the Roanoke Rapids plant. If, as a result of bargaining, a company proposal is modified, nothing in the order requires the modified version to be implemented at plants where the union is not the bargaining representative. The company retains the option to adopt or reject the results of bargaining at its other plants. Cf. Hollywood Brands, Inc., 142 NLRB 304 (1963), enforced, 324 F.2d 956 (5th Cir. 1964).
 
 III
 
 18
 The administrative law judge found two "persuasive arguments" for awarding litigation and negotiating expenses. First, he concluded that the case had presented "no significant factual controversies." Second, he held that the company in "bad faith" had displayed "willful and persistent defiance of the law." Additionally, he justified the award of negotiating expenses by reasoning that there was a nexus between the company's unfair labor practices and the union's fruitless expenses. The Board adopted, without amplification, the administrative law judge's analysis and findings concerning these monetary remedies.
 
 
 19
 The company challenges the award of these expenses on the grounds, first, that 29 U.S.C. § 186 bars such awards, and, second, that the award is contrary to the Board's precedents.
 
 
 20
 At the outset we dismiss the statutory argument. Section 186 was intended to prevent corruption by labor and management, and it does not apply to Board decisions, which are enforced through court order. See 29 U.S.C. § 186(c)(2).
 
 
 21
 Although the Act presents no obstacle to requiring reimbursement, we find merit in the company's second claim. Because we discern ambiguity in the administrative law judge's analysis and in the Board's silent adoption of his reasoning, we decline to enforce this part of the Board's order, and we remand these issues to the Board for further consideration.
 
 
 22
 In Heck's, Inc., 215 NLRB 765, 767 (1974), the Board stated its policy on the award of litigation and other expenses:
 
 
 23
 Thus, (prior) cases, when read together, indicated our intent to refrain from assessing litigation expenses against a respondent, notwithstanding that the respondent may be found to have engaged in "clearly aggravated and pervasive misconduct" or in the "flagrant repetition of conduct previously found unlawful," where the defenses raised by that respondent are "debatable" rather than "frivolous." Likewise, it was our intention, under similar circumstances, to refrain from ordering reimbursement of excess organizational costs although a nexus has been shown between such excess costs incurred by a union and the unfair labor practices committed by an employer.
 
 
 24
 The Board established in Heck's that a defense is "debatable" where the credibility of witnesses is involved and that reimbursement of these expenses cannot then be required. 215 NLRB at 768. It also observed that, while it would continue to apply this distinction between "debatable" and "frivolous" defenses, in a suitable case it would reconsider, clarify, or add to these governing principles, especially where necessary because of "the degree of repetition of misconduct." 215 NLRB at 768 & n.23. During the intervening years, however, the Board has adhered to its policy that these remedies are appropriate only when the defenses asserted by the charged party are "frivolous." See, e. g., Kings Terrace Nursing Home, 227 NLRB 251 (1976).
 
 
 25
 It was largely the lack of any factual differences that is, the absence of questions of credibility that induced the administrative law judge in this case to hold that the defenses were not debatable and that under Board precedent the company should reimburse the union and the Board for their expenses. The administrative law judge, however, did not explicitly rule that the company's defenses were frivolous. Perhaps in finding them not debatable he implicitly intended to find that they were frivolous. If so, we cannot accept this conclusion. In no case called to our attention has the Board held unequivocally that a not-debatable defense is a frivolous defense. The terms are not necessarily coextensive. In this case, for example, the administrative law judge ruled in favor of the company on several issues. Moreover, he sustained the company's objections to several remedies that the union proposed. Neither the administrative law judge nor the Board adverted to these indicia of the absence of frivolity.
 
 
 26
 We also detect ambiguity in the second argument advanced by the administrative law judge, and adopted by the Board, for imposition of this remedy. Heretofore, the Board has refused to require reimbursement even though "the respondent may be found to have engaged in 'clearly aggravated and pervasive misconduct' or in the 'flagrant repetition of conduct previously found unlawful.' " Heck's, 215 NLRB at 767. The Board has noted, however, that it "did not imply that the need for additional or expanded remedies may not be established by the degree of repetition of misconduct." 215 NLRB at 768 n.23. Relying on this footnote, the administrative law judge justified the award on the basis of the company's "bad faith" and "willful and persistent defiance of the law." He found precedent in an exception to the general rule disallowing fees in civil actions, applicable when an adversary engages in such conduct. Although the phrasing of the Board's rule in Heck's for denying reimbursement differs from that of the administrative law judge's in awarding reimbursement, we believe that there is no substantive difference in these standards.
 
 
 27
 The Board's decision leaves us uncertain about the basis of its award. The parties assumed that the Board's order rested on both of the arguments that the administrative law judge found persuasive. We cannot be sure. Two months after deciding the case under review, the Board decided J. P. Stevens & Co., Inc., 240 NLRB No. 35 (1979), enforced, 612 F.2d 881 (4th Cir. 1980). There, where credibility was an issue, the Board summarily denied the union's request for reimbursement of litigation expenses although the union, as here, buttressed its request by allegations referring to the company's "long history of violation . . . and its flagrant disregard of Board decisions and court orders." This decision raises a question about the likelihood that in the case under review the Board intended to adopt a new standard based solely on "the degree of repetition of misconduct."
 
 
 28
 Alternatively, the Board may have intended to change its standard of "frivolity" to a lesser one, applicable to cases in which some issues are decided in favor of the charged party. It may have contemplated requiring reimbursement when this lesser standard of not-debatable defenses combines with a certain degree of repetition of violations.
 
 
 29
 In short, it is difficult to ascertain from the administrative law judge's decision why the Board apparently departed from its precedents. Therefore, the Board should explicate more fully its reasons for requiring reimbursement in this case. The Board may change its policies. Indeed, it has a duty to alter them to respond to new circumstances. When it deviates from its precedents, however, it must make a reasoned explanation for the change. Remand for this purpose is appropriate. Greyhound Corp. v. ICC, 551 F.2d 414, 416 (D.C.Cir.1977); K. Davis, Administrative Law of the Seventies § 17.07-4 (1976).
 
 IV
 
 30
 Much of what we have said in Part II concerning the Board's broad discretion to fashion remedies is pertinent to the union's contention that the Board erred in not granting more extensive relief. The union proposed the creation of an interim dispute-settling mechanism to prevent further improper unilateral actions by the company. This was properly rejected because the Board concluded that it would trench on the principles of H. K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), which denies to the Board the power to compel agreement to substantive contractual provisions. The refusal to impose a corporate-wide bargaining order covering plants where the union has a card majority and the company has committed unfair labor practices precluding a fair election rests on precedent established in Heck's, Inc., 191 NLRB 886, 888 (1971), enforced in rel. part sub nom. Food Store Employees Union v. NLRB, 476 F.2d 546, 549-50 n.4 (D.C.Cir.1973), rev'd on other grounds, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974). Finally, in light of the Board's bargaining order, we find no abuse of discretion in its refusal to extend certification for two years. As the Board observed, if the company complies with the order one more year of bargaining should suffice; if the company does not comply, it will again be charged, and "the year will not have begun to run."
 
 V
 
 31
 In summary, the Board's order is enforced, save for paragraph (m) (as designated by the Board's modification of the proposed order) dealing with reimbursement for litigation and negotiating expenses. This issue is remanded to the Board for further consideration.
 
 
 
 [1]
 J. P. Stevens & Co., 239 NLRB No. 95 (1978)
 
 
 [2]
 Textile Workers of America, the elected bargaining representative, merged with the Amalgamated Clothing Workers of America in 1976. See generally America Enka Co., 231 NLRB 1335 (1977)